1           IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF IOWA
2                    CENTRAL DIVISION

3
- - - - - - - - - - - - - - X
4  JOHN DOE 1, JOHN DOE 2,     :
   JOHN DOE 3, and JOHN DOE 4, :
5                              :
6       Plaintiffs,            :     Case No. 3:25-cv-00042
                               :
6  vs.                         :     MOTIONS HEARING
7                              :        TRANSCRIPT
   DEPARTMENT OF HOMELAND      :
8  SECURITY; KRISTI NOEM, in   :
   her official capacity as    :
9  Secretary of Homeland       :
   Security; UNITED STATES     :
10 IMMIGRATION AND CUSTOMS     :
   ENFORCEMENT; and TODD LYONS :
11 in his official capacity as :
   Acting Director of U.S.     :
12 Immigration and Customs     :
   Enforcement,                :
13                             :
        Defendants.            :
14 - - - - - - - - - - - - - - X

15
                           Courtroom, First Floor
16                         U.S. Courthouse
                           123 Walnut Street
17                         Des Moines, Iowa  50309
                           Monday, May 5, 2025
18                         9:59 a.m.

19
   BEFORE:  THE HONORABLE REBECCA GOODGAME EBINGER
20

21

22

23
                   KARLA M. RAY, CSR, RDR, CRR
24                  United States Courthouse
                  111 Locust Street, Room 521
25                  Des Moines, Iowa 50309

```
 1   APPEARANCES:

 2   For the Plaintiffs:        KATHERINE MELLOY GOETTEL, ESQ.
                                MIKHAIL ACHERKAN, STUDENT PRACTITIONER
 3                              University of Iowa College of Law
                                380 Boyd Law Building
 4                              Iowa City, Iowa  52242-1113

 5   For the Defendants:        RACHEL J. SCHERLE, ESQ.
                                ANDREW H. KAHL, ESQ.
 6                              United States Attorney's Office
                                210 Walnut Street, Suite 455
 7                              Des Moines, Iowa  50309

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                     P R O C E E D I N G S

2        (In open court.)

3        THE COURT:  Thank you.  You may be seated.  We are here

4  in the matter of three [*sic*] John Does v. Kristi Noem and the

5  Department of Homeland Security.  This is Case Number

6  3:25-cv-42.  My name, as you know, is Rebecca Goodgame Ebinger,

7  and I am the district judge presiding.

8     If counsel would please identify themselves for purposes of

9  the record.

10        MS. GOETTEL:  Good morning, Your Honor.  Kate Melloy

11  Goettel on behalf of Plaintiffs.

12        MR. ACHERKAN:  Good morning, Your Honor.  Mikhail

13  Acherkan, also on behalf of the plaintiffs.

14        MS. GOETTEL:  And, Your Honor, we have a few law

15  students here with us.  Would you like them to note their

16  appearance for the record as well?

17        THE COURT:  No, thank you.

18        MS. GOETTEL:  Okay.

19        THE COURT:  On behalf of the United States?

20        MS. SCHERLE:  Good morning, Your Honor.  Rachel Scherle

21  on behalf of the Government.

22        MR. KAHL:  Andrew Kahl for the United States.

23        THE COURT:  And you are here representing all of the

24  defendants in this matter; correct?

25        MS. SCHERLE:  That is correct, Your Honor.

1          THE COURT:  So we have two matters the Court has before

2     it today.  We have a motion to proceed by pseudonym, which is at

3     Docket No. 9, and we have a motion for a preliminary injunction

4     at Docket No. 5.  It's the Court's intent to address the

5     proceeding by pseudonym first and then turn to the preliminary

6     injunction matter.

7        I understand from the filing at Docket 24, Ms. Goettel,

8     that you are handling the matter in regards to pseudonym and

9     that Mr. Acherkan -- am I saying that correctly?

10         MR. ACHERKAN:  Acherkan, Your Honor.

11         THE COURT:  Say it one more time.

12         MR. ACHERKAN:  Acherkan.

13         THE COURT:  Acherkan?

14         MR. ACHERKAN:  Yes.

15         THE COURT:  Okay.  I'll try my best.  Mr. Acherkan is

16     handling the matters in regards to the preliminary injunction;

17     is that correct?

18         MS. GOETTEL:  Yes, Your Honor.

19         THE COURT:  Thank you.

20        So we will proceed -- if you'd like to be heard in regards

21     to the motion to proceed under pseudonym.

22         MS. GOETTEL:  Yes.  Your Honor, and I'll just briefly

23     address our arguments in favor of the plaintiffs proceeding

24     under a pseudonym and specifically address the three factors

25     that the Eighth Circuit outlined in the *Cajune* case -- and I may

1  may be mispronouncing that -- C-a-j-u-n-e.

2      First, the defendants here are the Government.  We have

3  specifically sued two government officials in their official

4  capacity and the Department of Homeland Security.

5      THE COURT:  At this point, in order to allow the

6  government entities to comply with this Court's temporary

7  restraining order, has not the identities of Does 1, 2, 3, and 4

8  been provided to all of the defendants?

9      MS. GOETTEL:  That is correct.  After the TRO was

10  entered and there was some security as to them not being

11  detained or removed, we did provide those identities to the

12  defendants.  And so at this point they will not have any further

13  prejudice from not knowing the identities of the four

14  plaintiffs.

15      THE COURT:  Understanding that, at this stage and

16  assuming, without deciding that a preliminary injunction would

17  be granted, what -- and even if it isn't, the fact that that

18  disclosure has occurred, what continuing harm is being prevented

19  by the lack of proceeding in true name?

20      MS. GOETTEL:  Well, it isn't just the concern about

21  detention and removal but also the highly sensitive information

22  that is -- around this case and that has already been submitted

23  to the Court, including the individuals' immigration status,

24  their progression of study, their interactions with law

25  enforcement and criminal history, and for those reasons, we also

1   seek to proceed under pseudonym and would note that several

2   courts have already granted pseudonym motions in these SEVIS

3   cases.  As Your Honor may have noticed from our multiple *Doe v.*

4   *Noem* citations throughout our briefs --

5          THE COURT:  Obviously, I have not read every single

6   case.  There are tens of hundreds of these across the country in

7   various districts.  In looking at it, just in eyeballing it, it

8   seems that many are proceeding in true name.  And I didn't do a

9   count, but it seemed, in fact, more were proceeding in true

10  name.

11      Can you help me understand the specific facts in this case

12  that would justify proceeding by pseudonym, which you know is

13  something that is highly unusual and there is a very high

14  standard for?

15         MS. GOETTEL:  Yeah.  Well, all four of our plaintiffs

16  are concerned about their identity becoming known.  If we kind

17  of go through each one of them, you know, one of them is a Ph.D.

18  student who is concerned about his future progression, both in

19  the program and afterwards.

20      One is -- Doe Number 4 is already out working, and he is

21  concerned about his progression of his career should his

22  identity be known.

23      The other two are undergraduates, and they want to proceed

24  not -- without the rest of campus knowing who they are and that

25  they are the people who filed these lawsuits.

1    There is an overarching concern for all of them regarding

2   the sort of public nature of this issue, not just this lawsuit

3   but this issue, which has gotten a lot of attention, both here

4   in the state and nationally.

5    THE COURT:  So the *Cajune* opinion, which you just

6   referenced and I may also be mispronouncing, is telling in that

7   the Eighth Circuit very clearly did not believe that public --

8   without specific information available, that as to specific

9   harms to the individuals involved, that fear of reprisal from

10   political activists was not enough.  And this -- and they've

11   stated that only in limited circumstances where the parties'

12   need for anonymity outweighs countervailing interest of full

13   disclosure would proceeding by pseudonym be allowed.

14    Is there anything in the record that addresses with

15   specificity the risks to these individuals in proceeding in full

16   name?

17    MS. GOETTEL:  Well, I would say the subjective fear is

18   what we have in the record in terms of what they think is going

19   to befall them if they become known.  All of them are under an

20   incredible amount of anxiety and stress due to what has happened

21   to their SEVIS termination.  We don't have specific threats

22   against these specific individuals, but there is an overall

23   concern that there could be retaliation, there could be

24   harassment, discrimination if their names become known.

25    I would point out, you know, several of them didn't leave

1    their apartments after their SEVIS was terminated, but we've put

2    evidence in the record that one of them actually had to increase

3    their medication for their mental health.

4         THE COURT:  Assuming that the harm that's identified in

5    these affidavits has been addressed in terms of the -- at least

6    in the immediate sense, the TRO being entered.  For example, in

7    John Doe Number 1's affidavit, the paragraph dealing with

8    proceeding by pseudonym states, "I would like to proceed in this

9    litigation under pseudonym because I am worried that ICE or

10   other immigration agencies may use my information against me in

11   a retaliatory manner.  I haven't left my apartment for days

12   because I am afraid of being arrested and detained."

13        That's all I have for Doe Number 1 in regards to the

14   justification for proceeding by pseudonym.  And assuming that

15   the Government remains enjoined from taking those actions, what

16   continued justification is there for pseudonym?

17        MS. GOETTEL:  Well, and -- you know, I think what

18   Doe Number 1 in particular is worried about is he is worried

19   about his progression as a student and his name being known and

20   having effects on his career and his ability to move forward.  I

21   think the primary concern -- you're right -- is with regards to

22   ICE detention and removal.  But he continues to not want all of

23   the details of his life made public through this lawsuit, and

24   especially, you know, as he is moving forward towards the end of

25   the Ph.D. program that he has worked very hard for.  And so I

1   think his concern is mostly -- you know, aside from the

2   detention and removal, is around how it will affect his career

3   and how his information will be widely known.

4           THE COURT:   Thank you.

5       Did you want to be heard on the other factors under *Cajune*?

6           MS. GOETTEL:   I would just say briefly to -- while they

7   are not under criminal -- potential criminal prosecution, I do

8   think that if a preliminary injunction is not entered and they

9   are under threat of detention and removal, that is akin or very

10  close to criminal prosecution even though it doesn't reach that

11  high bar.  And so we would just note that if a preliminary

12  injunction isn't entered, that that would also weigh in

13  Plaintiffs' favor.

14          THE COURT:   Two questions in regards to that.  The

15  Government knows who these individuals are now.  I mean, it has

16  to be noted somewhere in their A-file or somewhere that these

17  people are not allowed to be arrested or deported or removed

18  from the jurisdiction.  That notation is there already.  How

19  does -- even if the Court doesn't enter a preliminary

20  injunction, that knowledge exists for the part of the Government

21  whether or not they are proceeding by pseudonym.  How does that

22  weigh in favor of continuing to proceed by pseudonym?

23          MS. GOETTEL:   And -- well, I'll just -- that is why we

24  are also seeking a protective order along with the motion for

25  pseudonym so that we can sort of cabin the use of that

1  information.  And, you know, I have been in communication with

2  Ms. Scherle, and she assured that it would be, you know, kind of

3  cabined to only those people who need to know.  And so I think

4  there's two different factors for why we want a pseudonym here.

5  One is the fear of ICE, but the other is they don't want their

6  information publicly known, you know, through the newspapers and

7  out in the world.  And so I think --

8      THE COURT:  Isn't that a standard concern for any

9  litigant, though, the public knowledge of the fact that you have

10  a civil lawsuit pending?

11     MS. GOETTEL:  I think it is -- it may be a concern for

12  litigants.  I think these litigants are in a particularly

13  vulnerable position, though, as international students,

14  particularly international students who have already been

15  targeted by ICE.  And so I don't think they are just a standard

16  litigant, and I think this also goes back to the fact that the

17  other side is not a private party but is a governmental entity.

18  And so their interest in knowing their -- or their interest in

19  proceeding publicly is not as strong as if it was two private

20  parties suing each other.

21     THE COURT:  One concern that I was curious about is if

22  these individuals' identities are unknown and they have an --

23  unknown generally -- and they have an interaction spontaneously

24  and without intent to violate the Court's order by an

25  immigration official or a law enforcement official generally,

1    what would prevent -- it would seem that having their identities

2    publicly available would provide them some level of protection

3    for the enforceability of the Court's order.  And if it's

4    cabined off too narrowly, they would not have that same

5    protection.  Help me understand the rationale in that regard.

6          MS. GOETTEL:  Well, and one remedy for that is that we

7    can file their names under seal, and we are willing to do that

8    so that if something like that happens, those names are already

9    with the Court under seal.  And that would seem to provide an

10   ability to -- you know, for the Court to understand that the

11   Court's order may have been violated or has been violated.

12         THE COURT:  Thank you, Ms. Goettel.

13      On behalf of the United States?  Or -- I keep saying the

14   United States -- Secretary Noem?  You may approach.

15         MR. KAHL:  Thank you, Your Honor.  I will try to be

16   brief and not repeat what we said in our briefing on the matter.

17   A couple of points based on the colloquy the Court just had with

18   Plaintiffs' counsel.  To the extent that there is highly

19   sensitive information that they are concerned about disclosing

20   in the public record, I assume that would be beyond what's

21   already been filed.  You know, there are alternative means that

22   the Court can employ such as allowing certain information to be

23   filed under seal, that that was appropriate.

24      The Government's view is -- or the defendants' view is that

25   most of the concerns are a generalized concern about public

1  disclosure that would be applicable to any litigant under the

2  Eighth Circuit's guidance.  Obviously, if we start with what's

3  almost a presumption that they would proceed under their own

4  names, the Court would have to find exceptional reasons,

5  exceptional circumstances, and then considering -- considering

6  the various factors that are laid out in the case law.

7      Our view is that to the extent there are concerns about any

8  action that the agency might take, that that is covered and

9  addressed adequately through the temporary restraining order

10  that the Court has already issued, that there is no --

11      THE COURT:  If the Court doesn't issue a preliminary

12  injunction, what interest does the Government have or does the

13  Department of Homeland Security have in having these names

14  public?

15      MR. KAHL:  I think a couple of interests.  One interest

16  is the general interest in public -- and transparency of

17  contested proceedings.  That's, obviously, more of a generalized

18  concern that cases take.  And I think as I'm thinking about

19  that, that's really the main thrust of the governmental

20  interest --

21      THE COURT:  Your initial response was that you needed

22  the information for practical reasons to be able to comply with

23  the Court's order.  That's been met.

24      MR. KAHL:  That has been addressed, correct.

25      THE COURT:  And so then you turn to the other

1   rationales, which is a generalized preference and, as you've

2   indicated, a standard of proceeding by name?

3          MR. KAHL:  That's what it boils down to, Your Honor.

4      The other point I would make is the agency knew who these

5   plaintiffs were at the time of the events that caused rise to

6   this lawsuit.  Even though we've been proceeding under the John

7   Doe pseudonyms thus far and although that information was

8   disclosed to us by Plaintiffs' counsel so that the TRO could be

9   complied with and the changes could be made in the SEVIS system,

10   just by the nature of the allegations themselves is evidence

11   that the agency would already have known who these individuals

12   were.  So I don't know that anything further could be

13   accomplished through a protective order or other order from the

14   Court.

15          THE COURT:  One of the issues raised in the affidavit,

16   as I read from the exhibit in regards to Doe Number 1, is a

17   concern about retaliation.  They specifically talk about

18   detention and deportation.  But, in general, if this is not

19   cabined off, how do you respond to the argument that the

20   individuals' names could result in recriminations moving

21   forward, meaning future attempts to enter the country lawfully

22   or otherwise, and having some level of retaliation by the

23   Department of Homeland Security or ICE?

24          MR. KAHL:  I think we would say that that would be so

25   speculative and generalized that under *Cajune*, that would be the

1   sort of circumstance that would not support proceeding under

2   pseudonyms.

3          THE COURT:  *Cajune* is more concerned with generalized

4   fear of the public at large.  Would you agree?

5          MR. KAHL:  Yes, I would agree.

6          THE COURT:  And this would be a specific fear as to

7   recriminations or retaliation by a government entity.  Is that

8   distinct?

9          MR. KAHL:  Well, those could be distinct.  I mean,

10  certainly the factors are nonexclusive as laid out in *Cajune*,

11  but I would take it back to what I said a moment ago, that this

12  information was all known to the agencies before the lawsuit was

13  filed.  So I'm not sure what proceeding under a pseudonym --

14  what additional benefit that will provide or additional -- how

15  that would change the lay of the land.

16         THE COURT:  Thank you, Mr. Kahl.

17      Any responsive argument from the plaintiffs?

18         MS. GOETTEL:  No, Your Honor.

19         THE COURT:  Thank you.

20      So the *Cajune* case here is probative, and, as has been

21  acknowledged by the parties, there are tens, perhaps hundreds of

22  these cases across the country.  There are some that are

23  proceeding by pseudonym.  There are some that are proceeding in

24  full name.

25      I reviewed the evidence that I have in front of me that was

1  put forth by the plaintiff.  The evidence includes four

2  affidavits from Does 1, 2, 3, and 4.  Each one contains one

3  paragraph dealing with the basis for why the individuals should

4  be permitted to proceed by pseudonym.

5      The standard is very high, and the last time this Court

6  wrote about the standard, it was not articulated by the Eighth

7  Circuit.  This Court, back in 2019, looked to the Second

8  Circuit -- or I guess it was 2017 as well -- for guidance on how

9  to deal with pseudonyms.

10     But the Eighth Circuit has now spoken, and the *Cajune*

11 opinion from last year provides guidance and articulates the

12 very high standard that is applied for determining whether or

13 not an individual should be able to proceed by pseudonym.  And

14 the question is whether the need for anonymity outweighs

15 countervailing interests in full disclosure, and the Eighth

16 Circuit highlighted the fact that proceedings are only truly

17 public when the public knows the identities of the litigants.

18     The factors that were considered there, which were not, as

19 has been stated, exhaustive, included the parties seeking

20 anonymity challenging a government entity.  Clearly, that is the

21 case here.  "Identification threatened to reveal information of

22 a sensitive and highly personal nature; and a party would be

23 required, absent anonymity, to admit an intention to engage in

24 illegal conduct, thereby risking criminal prosecution."

25     This is not a criminal prosecution case, but as the defense

1   has stated and as the plaintiffs recognize, deportation is a --

2   or the risk of deportation and involvement in the immigration

3   system is a corollary.

4        But looking at the factors that they set forth in *Cajune*

5   and specifically that the fear of reprisal from political

6   activists was not sufficient to justify the use of pseudonyms,

7   the Court finds that the evidence in this record is insufficient

8   to allow the plaintiffs to proceed by pseudonym.

9        Again, I have four paragraphs that have generalized

10  concerns:  Fear of an enforcement action or negative

11  consequences; ICE arrest, detention and deportation; ICE

12  retaliation; being targeted by ICE.  One -- Doe Number 3's

13  paragraph 12 talks about threats and harassment from other

14  groups.  There is nothing in the record that has been provided

15  to this Court that specifies harms that are specific as to these

16  defendants as -- in these cases outside of the generalized

17  nature of the claims that are being raised.

18       And so like many of the cases that are proceeding across

19  the country, the Court will require the plaintiffs to proceed in

20  true name and will be required to file updates to their

21  pleadings moving forward with the identities of Does 1, 2, 3,

22  and 4.

23       Any additional record in that regard from the plaintiff?

24            MS. GOETTEL:  No.  Nothing further, Your Honor.

25            THE COURT:  From the defendants?

1          MR. KAHL:  No, Your Honor.  Thank you.

2          THE COURT:  Okay.

3      So that addresses ECF No. 9.

4      Turning to the preliminary injunction motion at No. 5, the

5  Court entered its TRO back on the 24th of April.  We are here to

6  have an evidentiary hearing and argument on this matter.

7      I received exhibits -- in anticipation of this hearing from

8  the plaintiffs Exhibits 1 through 23.

9      Any objection to those exhibits from the defense?

10         MS. SCHERLE:  No, Your Honor.

11         THE COURT:  So the Court will admit and consider

12 Exhibits 1 through 23.

13     One of those includes a transcript from an individual who

14 also has an affidavit in this case, Andre Watson.

15     Any objection from the Government to considering the facts

16 set forth in that transcript, Exhibit 15, as in the record of

17 this case?

18         MS. SCHERLE:  No, Your Honor.

19         THE COURT:  Okay.

20     Defense provided Exhibit A, which is the declaration of

21 Andre Watson.

22     Any objection to A?

23         MR. ACHERKAN:  No, Your Honor.

24         THE COURT:  So A is admitted as well.

25     That is the universe of evidence that I have in regards to

1   the preliminary injunction.

2       Does the plaintiff intend to present any witnesses or

3   provide any additional evidence at this hearing?

4           MR. ACHERKAN:  No, Your Honor.

5           THE COURT:  Any additional evidence from the defense?

6           MS. SCHERLE:  No, Your Honor.

7           THE COURT:  Then we'll proceed with argument.

8       Mr. Acherkan?

9           MR. ACHERKAN:  Yes, Your Honor.

10          THE COURT:  You may proceed.

11          MR. ACHERKAN:  May it please the Court.  Once again, my

12  name is Mikhail Acherkan.  I am appearing on behalf of

13  Plaintiffs.

14      Your Honor, we seek a preliminary injunction to protect the

15  student plaintiffs for the duration of this case.  Our ultimate

16  claim is straightforward.  The agencies should follow the law as

17  well as their own rules, and international students have a right

18  to due process where they are having their student status

19  stripped from them.

20          THE COURT:  Both of the parties, mirroring this Court's

21  approach to the temporary restraining order, focused on the

22  Administrative Procedures Act and those claims.  Do you contend

23  that the preliminary injunction would also be appropriate to be

24  entered in regards to likelihood of success on the merits under

25  a due process claim?

1          MR. ACHERKAN:  Yes, Your Honor.

2     Your Honor, a convenient place to begin is to discuss the

3 defendants' own rules, two rules in particular.  Again,

4 referring back to our complaint, we identified these.

5     So first, 214.1(d), which the Court in *Jie Fang* recognized

6 is a limit on unilateral agency action to terminate status,

7 provides the defendants can in only three very specific, very

8 clear circumstances terminate student status.  None of those

9 circumstances apply to the plaintiffs.

10     Second, Your Honor, 214.1(g) provides for the lawful basis

11 to terminate student records -- excuse me -- based on criminal

12 activity.  There is a high standard there and a very clear one.

13 It must be for a crime of violence punishable by over a year in

14 prison.

15          THE COURT:  Mr. Watson's affidavit references the fact

16 that these individuals were terminated because of their criminal

17 history.  Is it your position that that's a reflection of

18 actions taken in violation of the provisions you have just

19 indicated?

20          MR. ACHERKAN:  Yes, Your Honor.  Prior to this most

21 recent action -- or the most recent conduct by the defendants,

22 there was never anything in the rules or the law indicating that

23 a conviction for something as simple as -- well, that

24 convictions for anything less than the standards under 214.1(g)

25 would qualify for a status termination, Your Honor.

1         THE COURT:   The -- for example, the affidavit says,

2    "Based on John Doe #2's criminal history, SEVP amended the SEVIS

3    record to reflect this information by changing the designation

4    to 'terminated.'"   Do you read that affidavit as putting forth

5    the justification for the termination?

6         MR. ACHERKAN:   Well, yes, Your Honor.   And I think here

7    is a good place to begin considering Defendants' assertion in

8    response to our complaint, which is that this termination did

9    amount to a termination of their status because it did -- at

10   least that's what our position is -- because it did and because

11   the basis for it is unlawful, it is our position that that

12   reflects the defendant agency's justification for the

13   terminations.

14        THE COURT:   Their response to the motion indicates a

15   number of different grounds where the action -- this Court

16   shouldn't take action, one of which is that it's not a final

17   agency determination.   How do you respond to that aspect of the

18   argument?

19        MR. ACHERKAN:   Your Honor, the standard for assessing

20   finality is that it must be an endpoint of an agency

21   decision-making process, and that endpoint must have legal

22   consequences.

23     First, to the idea that there was no deliberate

24   decision-making process.   We know that's not true, and we can

25   see that by looking at Mr. Watson's testimony in the *Patel v.*

1  *Bondi* case.  The deliberate process in this case was called the

2  Student Criminal Alien Initiative.  It involved a dragnet sweep

3  of all 1.3 million international students in the United States.

4  Whatever hits were identified there were slowly whittled down to

5  ensure that these were actual people with SEVIS records and then

6  passed between the Department of State as well as ICE for

7  ultimate termination.

8      I would note that Mr. Watson in his testimony acknowledges

9  the fact that many of the people who came up in the NCIC

10  database and checked against the entire population of

11  international students weren't even necessarily ever convicted

12  of a crime.  They had just been fingerprinted.

13          THE COURT:  So the question is is it a final agency

14  action, and your position is that the action is a final agency

15  action because it shows the deliberation and there is some legal

16  consequence; is that right?

17          MR. ACHERKAN:  Yes, Your Honor.

18          THE COURT:  And the legal consequence for the change in

19  the record as opposed to the change to the F-1 status, do you

20  see that as a distinction that is of import?

21          MR. ACHERKAN:  No, Your Honor.  And, in fact, the

22  Department of State takes a similar position.  Under Title 9 of

23  the Foreign Affairs Manual, Section 402.5-4(B), they state that

24  a SEVIS record is the definitive record of a person's status.

25  It is even more important than the I-20, which is the

1   certificate of eligibility students are issued that they have a

2   duty to safekeep and retain.

3        Furthermore, Your Honor, I would also point to Exhibits 17

4   and 18 where USCIS, by all appearances, takes a similar

5   position.  Those notices of intent to deny occur outside of this

6   recent round of terminations, and in both of those notices that

7   we have submitted, you can see that they are treating this

8   termination of status as indicative of a violation of status.

9        THE COURT:  In the materials that have been submitted,

10  there is a conflict between the affidavit from Mr. Watson, which

11  claims that the SEVIS change in record is not and has never been

12  considered by ICE to be a reflection of a change in F-1 status.

13  In the documentation you provided with the declaration of

14  Exhibit 16, how should the Court at this stage of the

15  proceedings treat that conflict of evidence?

16       MR. ACHERKAN:  Your Honor, the Court should consider

17  that conflict in light of all of the evidence we have submitted,

18  including what we have cited as the practice of the Department

19  of State as well as the USCIS.

20       Furthermore, Your Honor, if you look at the notifications

21  that the plaintiffs were sent by the University of Iowa's

22  International Students & Scholars services, they were each

23  advised by the DSO, who is an official who is designated whose

24  sole purpose is to advise students of maintaining -- maintaining

25  and being informed of what they need to do to keep status, in

 1  light of the terminations told -- or counseled each of them to

 2  seek legal assistance and to consult with an attorney.  That

 3  indicates that Ms. -- excuse me, Nusha Shishegar's position, the

 4  declarant from Exhibit 16, is consistent across at least the

 5  DSOs at the University of Iowa as well as, as we already

 6  mentioned, the other agencies, Your Honor.

 7       Your Honor, if I could just add one more point as far as

 8  the distinction between SEVIS records and status termination.

 9  There is this self-enforcing bar that comes out of terminating a

10  person's SEVIS record.  The idea that it doesn't affect status

11  just doesn't hold up to scrutiny because the same regulations

12  that exist which created the SEVIS program also created specific

13  reporting requirements that students by virtue of their DSOs

14  have to keep up with.

15       Further, the termination of just the SEVIS records

16  themselves carries with it legal consequences that are

17  functionally inseparable from having a person's status revoked.

18       Take, for example, what I've just mentioned about the

19  Department of State's denial of visas if they see a SEVIS record

20  that says anything besides "initial" or "active."  By virtue of

21  terminating a person's SEVIS record, they can never travel

22  outside of the United States.  Otherwise -- well, at least in

23  this particular case, they are not able to return because DOS

24  treats that as a definitive statement of the record, Your Honor.

25       If there's no more questions as far as the distinction

1   between SEVIS termination status, Your Honor, I'd like to

2   briefly address the claims raised by the defendant with regard

3   to jurisdiction.  As we've discussed about final agency action,

4   we both identified -- and using the agency's own officials --

5   the decision-making process as well as legal consequences.

6        I'd also like to point to the assertion that the Privacy

7   Act forecloses our ability to bring this claim.  It doesn't, and

8   we certainly are in the right court, because the Privacy Act

9   does not apply to noncitizens -- to noncitizen, nonpermanent

10  legal residents such as the plaintiffs.

11       The Privacy Act also exists to address different types of

12  harms and provides a different remedy, which is the simple

13  adjustment of the record.

14            THE COURT:  I've been looking at the cases as they've

15  been coming out across the country, and I have -- a number of

16  courts have entered TROs at this point, some of whom have

17  addressed the Privacy Act.

18       Are you aware of any courts reaching the conclusion in

19  favor of Homeland Security that the Privacy Act forecloses this

20  type of suit?

21            MR. ACHERKAN:  I am not, Your Honor.

22       And if there's no further questions as far as jurisdiction,

23  I'd briefly like to address the irrevocable harm.  As this Court

24  has already found -- well --

25            THE COURT:  Well, you don't get to rely upon my TRO

1   findings.  This is a fresh bite at the apple for both parties,

2   and it is the obligation to provide justification after full

3   briefing on it.  So as was noted in the order, a TRO is an

4   initial response from the Court, so you can't rely upon my

5   reasoning.  I appreciate hearing yours.

6          MR. ACHERKAN:  Okay.  Understood, Your Honor.

7      Well, in that case, first, I mean, I'd like to start with

8   what I previously mentioned about the bar on travel.  So as the

9   Court is aware, the plaintiffs have had their visas revoked.

10  When a SEVIS record is terminated, based on the Department of

11  Homeland Security's public-facing studies on its websites as

12  well as under 8 CFR 214.2, students are told they have three

13  options:  They can seek correction, reinstatement, or leave the

14  country.  Of those options, the only one with any potential

15  would be to leave the country and attempt to get a new visa

16  issued to them.

17     However, without having a preliminary injunction in place

18  for the duration of this -- for the duration of the case, none

19  of the plaintiffs are able to go home.  John Doe 3, for example,

20  is graduating in December of next year.  He has to spend the

21  next 18 months without seeing his family, and that is setting

22  aside the fact that he may want to or may need to out of

23  emergency go visit family somewhere and want to pursue visa

24  reinstatement, but he would be unable to do so if his SEVIS

25  record is terminated.

1      Furthermore, Your Honor, there is the continued threat of

2  removal.  Should the preliminary injunction not be granted and

3  students have their SEVIS records terminated again, the

4  likelihood of that is partially based on the fact that ICE has

5  signaled and filed in other courts, specifically in the District

6  of Arizona -- excuse me -- a policy that provides a

7  justification for revoking SEVIS records in the future based on

8  visa revocation.

9          THE COURT:  And that was the policy that you included

10  in your exhibits at Exhibit 14?

11          MR. ACHERKAN:  Correct, Your Honor.

12          THE COURT:  And there has been news coverage in

13  addition to that about different policy changes that have been

14  either proffered or effectuated.  As you sit here now, are you

15  familiar with the current status in terms of how SEVIS records

16  are being treated by the Department of Homeland Security?

17          MR. ACHERKAN:  No, Your Honor.  As far as our

18  plaintiffs in particular, we have no reason -- we have not been

19  formally provided any information or any notice suggesting that

20  their service records were restored on anything besides the TRO

21  that this Court has put in place --

22          THE COURT:  In the affidavit that was provided as

23  Exhibit A, all of the indications there is that as of April 24,

24  2025, the SEVIS record is active.  That's the date the temporary

25  restraining order was issued; correct?

1          MR. ACHERKAN:  Correct, Your Honor.

2          THE COURT:  And you have received no communication from

3    the other side as to any other rationale for that change in

4    status?

5          MR. ACHERKAN:  Correct, Your Honor.

6      And I think this may be a good point to bring up the fact

7    that the TRO ordered the agencies to backdate the restoration of

8    their SEVIS records to the date that they were initially

9    terminated.  That has not happened.  Based on the SEVIS event

10   history, which we have filed for each one of the plaintiffs, you

11   can see that the agency is not able to rely on the mandates of

12   the TRO and in the interim have committed to paper an intent to

13   reterminate SEVIS records for similarly situated plaintiffs who

14   have had their visas revoked.

15         THE COURT:  And you mean have -- when you say they have

16   committed on paper to doing that, you mean in that Arizona case?

17         MR. ACHERKAN:  Yes, Your Honor, as well as the exhibit

18   we submitted related to that policy.

19         THE COURT:  Well, that is the Arizona case; correct?

20         MR. ACHERKAN:  Yes, Your Honor.

21         THE COURT:  But the policy itself that was submitted in

22   the Arizona case isn't limited to that case; correct?

23         MR. ACHERKAN:  Correct, Your Honor.

24         THE COURT:  The event histories that you filed in this

25   court as the exhibits -- I think they're 18, 19, 20, and 21, are

1  those -- the dates on the top of those where it says -- not 18.

2  19, 20, 21, and 22.  The date at the top of those, is that the

3  date that those were run or effective on where it says "4/30/25,

4  10:12 AM"?

5        MR. ACHERKAN:  Your Honor, I'm not entirely sure.  I'd

6  have to double-check on that.  However, that is the most

7  up-to-date event history that we have.

8        THE COURT:  Thank you.

9        MR. ACHERKAN:  In closing, Your Honor, I'd just like to

10  say a few points on the final standard for a preliminary

11  injunction, which is, of course, what is in the public's

12  interest.  I'd like to note for the Court that in the room today

13  there are students and professors from the University of Iowa.

14  In other words, the effects of the community is here.  There is

15  a very clear statement and history of the importance of having

16  international students come and study in the United States as a

17  means of creating further understanding, furthering the

18  education of not just international students but also of the

19  community at large.

20        THE COURT:  How do you respond to the suggestion by the

21  Department of Homeland Security that assuming the Court enters a

22  preliminary injunction, that a bond should be entered?

23        MR. ACHERKAN:  I'd have to refer that question to

24  co-counsel.

25        THE COURT:  I'll let her address it on rebuttal, then.

1  Thank you.

2          MR. ACHERKAN:  Thank you.

3          THE COURT:  And the plaintiffs will have the

4  opportunity to respond after the completion of the defense

5  argument.

6      On behalf of the defense as to the preliminary injunction?

7      You can bring your water with you to the podium.

8          MS. SCHERLE:  That's okay.  Thank you, Your Honor.

9          THE COURT:  I know it's a small podium, though.

10          MS. SCHERLE:  Thank you, Your Honor.  May it please the

11  Court and counsel.

12      The SEVIS record termination does not equate to the

13  termination of a nonimmigrant status.

14          THE COURT:  I want to understand that position because

15  it seems as if there is no purpose for a termination in SEVIS if

16  it isn't a reflection of a change in status.

17          MS. SCHERLE:  The purpose of the SEVIS termination, as

18  described in the statement of Mr. Watson in the D.C. proceeding

19  and also the affidavit, it basically serves as a database to

20  have information regarding students who are studying within the

21  United States.

22          THE COURT:  Okay.

23          MS. SCHERLE:  With --

24          THE COURT:  The key there is that it's to have

25  information.  If it is merely a data input system, there would

1   have to be data that was being inputted.  And I'm struggling to

2   understand what data would be being inputted that reflects

3   termination if it is not a change in F-1 status.

4         MS. SCHERLE:  What it is and it serves as -- when the

5   SEVIS termination was done, it served as a type of red flag for

6   further investigation into the student's status.  It didn't

7   terminate the student's status.

8         THE COURT:  That seems internally inconsistent to use

9   the term "terminate" and then say it is not termination.  Can

10   I -- can you help me understand the verb?  When something is

11   terminated, it is ended.  It is final.  It is done.  Is there a

12   different meaning that I could attribute to that word in this

13   context?

14         MS. SCHERLE:  I don't think so because the term is

15   terminated.  The record was terminated.  It wasn't removed from

16   the system.  It was listed as terminated.  And what was done

17   according to DHS is that because of the NCIC hit -- and I

18   believe that procedure was detailed in the D.C. proceeding

19   that's in the record -- further investigation was needed to be

20   done to make sure that the students were in compliance with

21   their F-1 student status.  So the fact that it was terminated

22   from the system did not result in any termination of their

23   nonimmigrant status.  There are three --

24         THE COURT:  How would the DSOs that are receiving this

25   information know that?  When they get it and they see that this

1  has been terminated, the institutions across the country and in

2  this instance University of Iowa is called upon to comply with

3  these regulations, which restricts the ability for individuals

4  with terminated status to do certain things, how would the DSOs

5  who got this information in reviewing the SEVIS designation as

6  terminated have any idea that it was anything other than a

7  determination that the -- all of the implications for someone

8  being terminated need to be taken into account by the University

9  of Iowa, and they needed to take the steps that they needed to

10  ensure that they were in compliance with ICE's expectations?

11       MS. SCHERLE:  What the DSOs are able to do is they are

12  able to correct a termination of SEVIS if they believe it was in

13  error or it was not correct.  There are options to pursue

14  correction reinstatement through the SEVIS system, and the

15  school's designated official is given detailed instructions on

16  how to correct or fix that SEVIS termination if they believe it

17  was in error on the SEVIS website.

18       THE COURT:  Where in the record is there any

19  information that shows that the -- the DSOs here and the

20  exhibits that have been entered that say that they believe that

21  it was done in error and that the students should seek counsel,

22  that they had other information that would allow them to take a

23  different action?

24       MS. SCHERLE:  I would just say that that information

25  was available on the SEVIS website if they felt there was an

1    error and needed to correct it, but I don't know of anywhere

2    else in the record that I could point you to.

3              THE COURT:  You may proceed with your argument.

4              MS. SCHERLE:  Thank you.  What we're dealing with in

5    this case are three separate concepts.  When I discussed prior

6    the SEVIS record, it is a recordkeeping system used to maintain

7    information on certain noncitizens.  In this case, it is the F-1

8    student noncitizens.

9         Second, we are also dealing with visas, and those are

10   issued by the State Department.  And those just reflect the

11   permission to enter the United States.  And in this case, with

12   the F-1 visas, they are for duration of status.  And so these

13   students are allowed to enter and stay in the United States as

14   long as they have their F-1 student status.  There is no set

15   time limit on their ability to stay in the United States with

16   the duration of status.

17        And then also, finally, what we are dealing with is

18   nonimmigration status, and that's the noncitizens formal

19   immigration classification in the United States.  And as the

20   declaration from Mr. Watson states, the termination of a SEVIS

21   record only terminates the first of these.

22             THE COURT:  Let me -- since you mentioned the DHS web

23   page, the plaintiff cites in their materials a DHS web page for

24   DSOs that states, "When a SEVIS record is terminated, the

25   student must leave the United States, file for reinstatement, or

1    take another action to remain in status."

2        Would that not suggest that they are no longer in status if

3    those are the actions that they have to take when their record

4    is terminated?

5        MS. SCHERLE:  The current agency position, according to

6    DHS, is that it does not affect student status and --

7        THE COURT:  When did that position change?

8        MS. SCHERLE:  It's my understanding it has always been

9    the position of DHS, and I know that we've been referencing a

10   quote, unquote, new policy.  I was hesitant to bring forth the

11   policy because, one, I didn't have a declaration speaking about

12   such policy, and the policy itself says it's for internal SEVP

13   review only, but now it is in the record.  And I believe --

14       THE COURT:  Do you agree that that policy that was

15   Exhibit 14 is the policy that is being referenced as the new

16   policy?

17       MS. SCHERLE:  That is correct, Your Honor.

18       THE COURT:  And is it the position of the Department of

19   Homeland Security that this is not a new policy and that it's a

20   continuation of some prior policy?

21       MS. SCHERLE:  I believe DHS considers it to be a

22   clarification of the policy due to the various lawsuits that

23   have arisen across the country.

24       THE COURT:  And looking at the language in that policy,

25   where it says SEVP can terminate records for a variety of

1    reasons, and it lists those various rationales, is it the

2    position of the Department that those rationales are all

3    consistent with the regulations that allow for termination?

4             MS. SCHERLE:  That is correct.

5             THE COURT:  Can you point me to the regulations that

6    they derive from?

7             MS. SCHERLE:  Yes.  And this is regarding the

8    termination of the SEVIS record itself.  I apologize.  I have

9    too many notes on this.  There are a lot of issues.

10        But what can be done, the policies are...  And I apologize,

11   Your Honor.  I have too many notes here.

12            THE COURT:  My question was the regulation from which

13   this guidance derives.

14            MS. SCHERLE:  Yes.  It looks like when we're talking

15   about termination of nonimmigrant status, those regulations are

16   detailed in 8 CFR 214.1(d).  And then also there are regulations

17   regarding failure to maintain status, which is 8 CFR 214.1(e)

18   through (g).  So those are the facts --

19            THE COURT:  And (g) is the criminal activity?

20            MS. SCHERLE:  Correct.

21            THE COURT:  And that specifies that a nonimmigrant's

22   admissions and continued stay in the United States is obedience

23   to all laws which prohibit the commission of crimes of violence

24   and for which a sentence of more than one year of imprisonment

25   may be imposed.

1          MS. SCHERLE:  Correct.

2      So my interpretation of and DHS's interpretation of this

3   policy is that SEVP can terminate these records for a variety of

4   reasons which we've talked about, and I gave you the

5   regulations.  But it doesn't say that it's necessarily a

6   termination of the student's status because what does happen

7   with the SEVIS termination is it's merely a red flag for further

8   investigation of a violation of any of these regulations.

9          THE COURT:  You keep saying it's a red flag for

10  investigation, and I'd like you to help me understand where that

11  is documented, that terminate doesn't mean terminate of status,

12  terminate something.  The record is terminated.  It doesn't say

13  "red flag, investigate."  It doesn't say "paused."  It doesn't

14  say "this record is under review."  It says "terminate."  Help

15  me understand how a student or a DSO would know that this is, in

16  fact, not a termination of their record, reflecting a status

17  change.

18          MS. SCHERLE:  The only information that I have in the

19  record, Your Honor, is the testimony of Mr. Watson in the D.C.

20  Circuit where he describes the termination of a SEVIS record as

21  something akin to a red flag saying, hey, there was an NCIC hit

22  on this person.  We need further investigation to make sure it

23  doesn't affect their F-1 student status.

24          THE COURT:  I understand your position.

25      The information in the affidavit that Mr. Watson has is

1   that the language in paragraph 4 points to 8 U.S.C. 1372 for the

2   Government to develop and conduct a program to collect

3   information regarding nonimmigrant students.  And then he says,

4   "Inherent in that authority is SEVP's ability to update and

5   maintain the information in SEVIS and, as such, to terminate

6   SEVIS records, as needed, to carry out the purposes of the

7   program."

8        That was the only thing I could see in the affidavit that

9   dealt with the basis for termination.  Is there somewhere else I

10  should be looking to understand the position?

11       MS. SCHERLE:  Just the affidavit and then the prior

12  testimony that I just referenced.

13       THE COURT:  And then the -- you may proceed with your

14  argument.

15       MS. SCHERLE:  Thank you.

16       As you just referenced, Your Honor, 8 U.S.C. 1372, as

17  stated in the declaration by Mr. Watson, states that it doesn't

18  provide SEVP the authority to terminate the nonimmigrant status

19  by terminating a SEVIS record.  So that statute, as you stated,

20  provides SEVP the ability to keep records, maintain records as

21  needed, and there is no power to terminate nonimmigrant status

22  just by the termination of the SEVIS record.  That's not --

23       THE COURT:  How do you respond to the cases and the

24  authority where -- for example, in the -- the idea that this has

25  no impact when individuals who have been trying to come back

1  into the country have, in fact, been prohibited from coming into

2  the country when their SEVIS record did not accurately reflect

3  their SEVIS status?

4      MS. SCHERLE:  Without knowing the specifics of each of

5  those individuals, I am unable to answer that.  But in

6  responding to the Court's...  There are various cases, one in

7  the Ninth Circuit, the *Albence* case -- I am not even going to

8  try to pronounce the first name of the plaintiff -- where the

9  Court makes note that basically the termination of a SEVIS

10  record was a clerical duty performed as a preliminary matter.

11      There is also a Western District of Virginia case, the *Yun*

12  *Zhao* matter, which describes the modification of a SEVIS record

13  as a ministerial act.

14      THE COURT:  Let's talk -- the case I was looking at was

15  the *Liu v. Noem* case that just came down from the District of

16  New Hampshire.  It was dealing with a preliminary injunction in

17  the same procedural posture of this case, but it was interesting

18  to the Court because it went through the history of this

19  particular individual and that previously there was an instance

20  where this individual was unable to enter the country because of

21  the fact that his SEVIS record was inaccurately listed as

22  being -- it hadn't been updated.

23      And as part of this history, it said that the officer

24  confirmed Liu's student status but was unable to approve his

25  entry without an active SEVIS record.  That would seem to

1    suggest that even if you know that the status is correct, if the

2    record says that you're not active, that there is an impact of

3    that, and it's assumed to be reflecting the correct status.

4            MS. SCHERLE:  I believe how you have reiterated the

5    facts of that case are correct, but it is the Department of

6    Homeland Security's position that the SEVIS record is merely a

7    record.  That's all it is, and it does not impact the ability to

8    travel within or without of the United States.  That would be a

9    visa issue.  And that is the current information that I have

10   from the Department.

11           THE COURT:  And that would appear to be inconsistent

12   with how the Department of Homeland Security addressed this

13   individual that is reflected in this opinion from the District

14   of New Hampshire; correct?

15           MS. SCHERLE:  That would be correct.

16       Now to the regulations regarding the termination of the

17   nonimmigrant status regulations.  Those are the ones that are

18   set forth in the 8 CFR 214.1(d), and that would be termination

19   of a particular immigration waiver, a private bill confirming

20   permanent residency, or the termination/modification in the

21   Federal Register.

22           THE COURT:  And none of those occurred here; right?

23           MS. SCHERLE:  That is correct.  In addition, none of

24   the 8 CFR 214.1(e) through (g) factors occurred either, and that

25   would include the criminal activity crime of violence.

1          THE COURT:  So none of the -- you acknowledge that none

2    of the factors that would result in the termination of F-1

3    status exist in this case?

4          MS. SCHERLE:  To ICE's knowledge at this present time,

5    that is correct.  And for those reasons, that is why most, if

6    not some, of the other students involved in these types of cases

7    were reinstated to SEVIS because it was after further

8    investigation into the NCIC records --

9          THE COURT:  And in this case, the affidavit from

10   Mr. Watson states plainly that the records were updated to

11   active, but it was on the date of this Court's restraining

12   order.  You agree?

13         MS. SCHERLE:  That is what the database shows.  ICE was

14   provided numerous times with your order, Your Honor.  And I am

15   not sure of what the intricacies of the actual system are, but

16   we did request that they follow your order, and that would

17   include the backdating.  I don't know if there is an additional

18   drop-down that would provide some more information.  I don't,

19   obviously, have the system in front of me, but that's

20   information that I can provide the Court as soon as possible.

21         THE COURT:  You agree that the records that are in the

22   court's record now reflect that they have not complied with the

23   Court's instruction to provide the date of status back to the

24   date in which it was originally changed?

25         MS. SCHERLE:  How the records appear now, that would be

1 | correct.

2 |       THE COURT:  And there's nothing in the affidavit that

3 | suggests that the change was done for any other purpose other

4 | than to comply with this Court's order?

5 |       MS. SCHERLE:  That is correct.

6 |  I would note the timing of this seems to suggest they were

7 | put back in SEVIS as a result of the review of the record, and

8 | that's what has resulted in the reinstatement of other students,

9 | but I am not in a position at this time to tell the Court that

10 | it was for any other reason than the ordering of DHS to do so.

11 |       THE COURT:  You just said the timing of this seems to

12 | suggest they were put back as a result of the review.  You don't

13 | mean the review of my order?  You mean the review of the records

14 | of these plaintiffs?

15 |       MS. SCHERLE:  Yes.

16 |       THE COURT:  And you believe the timing suggests that

17 | that was the precipitating event and not the fact that this

18 | Court entered an order on that date?

19 |       MS. SCHERLE:  I believe it was -- I -- I shouldn't

20 | speak to that.

21 |       THE COURT:  Thank you.

22 |       MS. SCHERLE:  Thank you.

23 |       THE COURT:  Are you maintaining the position that the

24 | Privacy Act prevents this Court from considering this?

25 |       MS. SCHERLE:  Yes, Your Honor.

1          THE COURT:  Can you point me to any court in the

2    country that has adopted that approach?

3          MS. SCHERLE:  No, Your Honor.

4          THE COURT:  You may proceed with your argument.

5          MS. SCHERLE:  Thank you.

6      As this Court is aware, the *Dataphase* four-factor test

7    instructs us on when a preliminary injunction should be entered.

8    It is an extraordinary remedy.

9      First, there is the threat of irreparable harm.  There is

10   the balance between this harm.  Excuse me.

11         THE COURT:  You can get water if you need, Ms. Scherle.

12         MS. SCHERLE:  Yeah.  That would be great.  Thanks.

13     Thank you, Your Honor.  I appreciate that.

14         THE COURT:  Of course.

15         MS. SCHERLE:  And then we have the state of the balance

16   between this harm and the injury granting the preliminary

17   injunction will inflict on another party, and then the

18   probability that the movement will succeed on the merits and

19   then finally the public interest, and for students against the

20   Government, the second and fourth factor are typically combined.

21         THE COURT:  You didn't address -- and neither did the

22   plaintiff -- the Court's -- as I said, mirroring the Court's

23   analysis in the TRO, issues related to due process and the due

24   process claims.  You acknowledge that the Court could enter a

25   preliminary order on those grounds if the law supported it?

1          MS. SCHERLE:  That is correct, Your Honor.  And as I

2     was preparing my oral argument, I realized in the brief there

3     may be some allusions to the due process argument, but I didn't

4     brief that in full, and I apologize.  If I may address that now?

5     Thank you.

6          Because it is the Department of Homeland Security's

7     position that nonimmigrant status is not terminated, there is no

8     property interest in the SEVIS record.  To show a due process

9     claim under the Fifth Amendment, the plaintiffs need to show or

10    identify a protected liberty or property interest, and they must

11    allege that the defendant deprived them of that interest without

12    adequate constitutional process.

13         There are a number of cases -- the *Zhao* case, which is 2018

14    WL 5018487, discusses that regulations alone cannot provide a

15    private right of action.  And the SEVIS regulations do not

16    demonstrate that Congress intended to create a private right of

17    action.

18         There is also an Eighth Circuit district court case out of

19    the Eastern District of Missouri, *Bakhtiari v. Beyer*.  And,

20    again, that's another Westlaw cite -- excuse me.  No, that is

21    correct.  2008 WL 3200820.

22          Then there is also *Fan v. Brewer* from the Southern

23    District of Texas, and that was affirmed by the Fifth Circuit,

24    and that is 2009 WL 1743824.  And that cites merely updating a

25    student's SEVIS record didn't violate any constitutional right

1  regarding the due process argument.

2      So there are cases around the country that support the fact

3  that because this was just an entry into the record, that there

4  is no protected property interest in the SEVIS record.

5          THE COURT:  How do you respond to the argument that the

6  communications that followed from the change to the SEVIS record

7  appeared to reflect the fact that there was a change in status?

8          MS. SCHERLE:  Your Honor, I would say that those

9  communications did not come from DHS.  It appears they came from

10 the embassies on behalf of the State Department.  And those

11 notices were not sent by the current defendants in that case, so

12 I don't have that information.

13         THE COURT:  Did you want to be heard further on the

14 *Dataphase* factors, Ms. Scherle?

15         MS. SCHERLE:  No.

16         THE COURT:  I did want to ask you about the request in

17 the materials for a bond.  What damages would a bond be related

18 to if the Court had entered these -- either the TRO or a

19 preliminary injunction in error?

20         MS. SCHERLE:  I have not received any information from

21 the agency regarding any damages, and so I cannot speak to that.

22         THE COURT:  The basis for the request is that the

23 agency wants a bond?

24         MS. SCHERLE:  That is correct.

25         THE COURT:  Thank you, Ms. Scherle.  I understand your

1  argument.

2       Responsive argument from the plaintiffs?

3            MS. GOETTEL:  Your Honor, could we have one moment,

4  please?

5            THE COURT:  Of course.

6       (Ms. Goettel and Mr. Acherkan conferred off the record.)

7            THE COURT:  Ms. Goettel, you can also divide your time

8  if you wish.

9            MS. GOETTEL:  I think that's what we'll do.

10  Mr. Acherkan will start.

11           THE COURT:  Thank you.

12           MR. ACHERKAN:  May it please the Court.

13      Your Honor, you asked whether or not the policy in Exhibit

14  14 is a new position.  We know that it's a new position, one,

15  based on just considering what's in the DHS website and the

16  language that Your Honor referenced, as well as between that and

17  the fact that it notes that there are policies in there which

18  are effective immediately.  This new policy both doesn't comply

19  with the standards for amending any regulation.  If anything, it

20  is simply after-the-fact rationalization.

21           THE COURT:  Meaning it didn't go through notice and

22  comment and isn't incorporated in the CFR in any way and was a

23  communication to the agency without the standard procedures that

24  are required for a change in policy?

25           MR. ACHERKAN:  Correct, Your Honor.

1        Further, as mentioned earlier, it is inconsistent with the

2   position of 8 CFR 214.1(d).  Defendant has provided no other

3   regulation, no other legal authority for the legality of this

4   new policy except for restating the legal conclusions provided

5   by Mr. Watson.

6        And, finally, Your Honor, as to what's been discussed as

7   far as due process, there is very clearly lack of due process,

8   as we see that no notice was provided at all.  While the

9   regulations may not provide very clear specifics on what notice

10  and an opportunity to be heard would mean for these plaintiffs,

11  we know that those being the essential elements, we can simply

12  see that they are absent.

13        THE COURT:  When you are looking at the due process

14  claim, are you basing the due process claim on the SEVIS record

15  specifically and believe that there was specific process

16  required before that terminated status could be provided?

17        MR. ACHERKAN:  Yes, Your Honor.

18        THE COURT:  And are you acknowledging that there is not

19  a specific process that's outlined anywhere?

20        MR. ACHERKAN:  Correct, Your Honor.  However, I would

21  say, again, there was simply no process.

22        THE COURT:  And so the absence of process, even in the

23  fact that there is no regulation that sets forth process, is the

24  basis for your claim?

25        MR. ACHERKAN:  Yes, Your Honor.

1          THE COURT:  I understand your position, and you may

2    cede your time to Ms. Goettel.

3          MS. GOETTEL:  Your Honor, I will very briefly address

4    bond.  First is the factor that Your Honor pointed out, that

5    they have not identified any need for bond.  And so because this

6    is a case in which there is a public interest at stake and no

7    identification of bond, we would ask the Court to follow the

8    Eighth Circuit's case in *Richland/Wilkin* and not require any

9    bond in this case.

10         When we last looked at the case law last week, we hadn't

11   yet identified any of the SEVIS cases where courts have granted

12   bond.  They are coming out fast, and that was as of a few days

13   ago.  But we think the same should be true here, that bond is

14   not necessary, particularly where there hasn't been an

15   identification of need for the bond.

16         THE COURT:  Thank you for the response on that

17   specifically.

18         I wanted to ask about the extension of the TRO.  As you

19   know, the standard is good cause.  This Court entered that TRO

20   on the 24th.  It's good for 14 days.  It's renewable under the

21   rules for another 14 days.

22         Is the plaintiffs' position -- understanding I am not going

23   to rule from the bench on the preliminary injunction.  I will

24   issue a written ruling.  What's the plaintiffs' position on the

25   extension of the TRO at this time?

1          MS. GOETTEL:  We think an extension of the TRO until

2    the preliminary injunction is ruled upon is warranted here.

3    Part of the reason why an extension of the TRO is warranted and

4    part of the reason why a preliminary injunction is necessary is

5    that we are hearing shifting policies.  We have a new policy

6    that wasn't even mentioned by Defendants that we have inserted

7    into the record.  And because of the shifts that we are seeing

8    from the Department of Homeland Security, we think it is even

9    more important now than even at the time we filed our original

10   motion that we preserve the status quo for the defendants [*sic*]

11   throughout the duration of the case.

12        But to answer your question directly, we do think the TRO

13   should be extended until the preliminary injunction could be

14   ruled upon.

15          THE COURT:  Thank you.  And by "rule," that's another

16   14 days after the original TRO expires?

17          MS. GOETTEL:  Yes.

18          THE COURT:  Thank you.

19        Ms. Scherle, does the Government have any objection --

20   understanding that you are opposing the TRO and you have opposed

21   the preliminary injunction, any objection to the extension of

22   the TRO for the -- under good cause under the rules for the

23   additional 14 days?

24          MS. SCHERLE:  I have been instructed by my client not

25   to agree to any extension of the TRO.

1          THE COURT:  Based upon the record here before the

2    Court, the Court finds that the standard of good cause has been

3    met for extension of the TRO.  The Court, under Rule 65(b)(2) of

4    the Federal Rules of Civil Procedure, the Court can extend a TRO

5    for an additional 14-day period of time or longer if the adverse

6    party consents to a longer extension.

7          Here, the grounds for the extension of the TRO after the 14

8    days are expired would be the basis of the dynamic status of

9    this case, the evolving positions, as well as the need to

10   understand the intricacies of these policies as they are being

11   updated and how that impacts the case at hand.

12         So the Court will extend the TRO beyond the 14 days for an

13   additional 14 days or until this Court enters a preliminary

14   injunction, whichever comes first.

15         I don't know -- the Court has a very busy docket, as you

16   know.  Obviously, this is an issue that will require immediate

17   attention by the Court.  But should the Court need that

18   additional time, it has now been entered consistent with the

19   rules.

20         Any additional record in that regard as to the extension of

21   the TRO from the plaintiff?

22         MS. GOETTEL:  No, Your Honor.

23         THE COURT:  From the defense?

24         MS. SCHERLE:  No, Your Honor.

25         THE COURT:  As you-all are, I am also watching these

1    cases as they are unfolding across the country.  I do not need

2    to be updated by you on what has changed across the country

3    except to say that if there is a ruling that particularly

4    addresses the issues in a way that you believe would be

5    particularly helpful, I am happy to have that citation provided

6    to the Court.

7        I am not asking you to do that.  We are going to be

8    addressing these issues in the same way that my colleagues

9    across the country are addressing these issues.

10       If there is a change in the position of the United States

11   or at the Department of Homeland Security in any case across the

12   country that implicates the positions that have been taken in

13   this case, I would expect the defense to bring that to my

14   attention immediately.

15       I don't know if that means a difference in policy or a

16   withdrawal of approach or an acknowledgment, for example, that

17   the Privacy Act doesn't bar these types of cases.  Any change in

18   position being taken by the Department in any case across the

19   country that is relevant to the issues in this case should be

20   brought to this Court's attention in an expedited way.

21       Any questions as to the Court's expectation in that regard,

22   Ms. Scherle?

23           MS. SCHERLE:  No, Your Honor.

24           THE COURT:  Anything further on behalf of the plaintiff

25   at this time?

1          MR. ACHERKAN:  No, Your Honor.

2          THE COURT:  On behalf of the defense?

3          MS. SCHERLE:  No.  Thank you.

4          THE COURT:  The Court will take the matter under

5    advisement.

6      In regards to the ruling on the motion for proceeding by

7    pseudonym that was denied, it has been suggested in other cases

8    that if individuals wish to withdraw from the case as opposed to

9    proceeding with their true name, that that is an option that

10   courts have provided to plaintiffs.

11     At this time are you asking the Court to allow that to

12   occur, Ms. Goettel?

13         MS. GOETTEL:  We are not, Your Honor, but we would like

14   another opportunity to consult with our clients before we state

15   that definitively.  Can we have the opportunity to do further

16   consultation?

17         THE COURT:  What is the timeline that you are

18   requesting?

19         MS. GOETTEL:  Could we have 24 hours?

20         THE COURT:  So today is the 5th.  I would ask that you,

21   by close of business tomorrow, go ahead and file either a

22   withdrawal of a plaintiff or the updated information identifying

23   the individuals in the case.

24     Any objection to proceeding in that way?

25         MS. GOETTEL:  No, Your Honor.  Thank you.

1          THE COURT:  From the defense?

2          MS. SCHERLE:  No, Your Honor.

3          THE COURT:  Okay.

4      We'll be in recess.  Thank you.

5      (The proceedings concluded at 11:18 a.m.)

```
1                         I N D E X

2                       E X H I B I T S

3
   PLAINTIFFS' EXHIBITS:                              ADMITTED
4
   1.  Declaration of John Doe Number 1                  17
5  2.  Email from Univ. of Iowa Office to Doe Number 1   17
   3.  Email from New Delhi Embassy to Doe Number 1      17
6  4.  Declaration of John Doe Number 2                  17
   5.  Email from Univ. of Iowa Office to Doe Number 2   17
7  6.  Email from Vancouver Consulate to Doe Number 2    17
   7.  Declaration of John Doe Number 3                  17
8  8.  Email from Univ. of Iowa Office to Doe Number 3   17
   9.  Email from Guangzhou Embassy to Doe Number 3      17
9  10. Declaration of John Doe Number 4                  17
   11. Email from Univ. of Iowa Office to Doe Number 4   17
10 12. Email from Guangzhou Embassy to Doe Number 4      17
   13. SEVIS TROs from other jurisdictions               17
11 14. April 26, 2025 ICE policy re termination of records 17
   15. Transcript of Preliminary Injunction Patel v. Lyons 17
12 16. Declaration and CV of Nusha Shishegar             17
   17. Notice of Intent to Deny Reinstatement Request    17
13 18. Notice of Intent to Deny Request for Change of Status 17
   19. SEVIS Event History for John Doe Number 1         17
14 20. SEVIS Event History for John Doe Number 2         17
   21. SEVIS Event History for John Doe Number 3         17
15 22. SEVIS Event History for John Doe Number 4         17
   23. Email from U of Iowa Int'l Programs to Doe Number 3 17
16

17 DEFENDANTS' EXHIBIT:

18 A.  Declaration of HSI Senior Official, Andre Watson  17

19

20

21

22

23

24

25
```

53

1                    C E R T I F I C A T E

2        I, Karla M. Ray, a Certified Shorthand Reporter of the

3    State of Iowa and Federal Official Realtime Court Reporter in

4    and for the United States District Court for the Southern

5    District of Iowa, do hereby certify, pursuant to Title 28,

6    United States Code, Section 753, that the foregoing is a true

7    and correct transcript of the stenographically reported

8    proceedings held in the above-entitled matter and that the

9    transcript page format is in conformance with the regulations of

10   the Judicial Conference of the United States.

11       Dated at Des Moines, Iowa, August 6th, 2025.

12

13

14                         /s/ Karla M. Ray
                           Karla M. Ray, CSR, CRR, RDR
15                         Federal Official Court Reporter

16

17

18

19

20

21

22

23

24

25